**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

_____

| | |
|---|---|
| TODD DAMASE OUELLETTE, | CV 10-133-M-DWM-JCL |
| Plaintiff, | |
| vs. | |
| VIACOM, and NBC UNIVERSAL, | FINDINGS AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |
| Defendants. | |

_____

## I. BACKGROUND

Plaintiff Todd Ouellette is proceeding pro se in this action. Also, by Order entered December 8, 2010, the Court granted Ouellette's Motion to Proceed In Forma Pauperis under 28 U.S.C. § 1915.

Section 1915 requires the Court to conduct a preliminary screening of the allegations of a complaint filed by a plaintiff proceeding in forma pauperis. The statute states as follows:

> (2) Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that–
>
>     (A) the allegation of poverty is untrue; or
>
>     (B) the action or appeal–

1

> (i) is frivolous or malicious;
>
> (ii) fails to state a claim on which relief may be granted; or
>
> (iii) seeks monetary relief against a defendant who is immune from such relief.

28 U.S.C. § 1915(e)(2).

In accordance with § 1915(e)(2), the Court reviewed Ouellette's allegations in Count I of his Amended Complaint filed on January 5, 2011. By Order entered February 7, 2011, the Court concluded that those allegations, accepted as true, at least state a cognizable claim for relief under the Digital Millennium Copyright Act of 1998. The Court will now proceed to review Ouellette's allegations in Counts II through VIII of Ouellette's Amended Complaint to consider whether those claims survive dismissal under § 1915(e)(2). *See Huftile v. Miccio-Fonseca*, 410 F.3d 1136, 1138, 1142 (9th Cir. 2005).

## II. PLAINTIFF'S ALLEGATIONS

The allegations set forth in Ouellette's Amended Complaint stem from his use of various internet websites, such as YouTube.com and Myspace.com, for the purpose of uploading and publishing (or posting) videos that he has produced. In general, Ouellette contends Defendants have interfered with his ability, and his asserted legal right, to post his videos on the internet.

Defendants' alleged interference, however, stems from accusations made against Ouellette asserting that his videos infringe upon various copyrights owned by other parties, including some of the Defendants named in this action. Nonetheless, Ouellette alleges Defendants have wrongfully accused him of infringing upon copyrights they own, have improperly removed his videos from the internet, and have refused to replace his videos on the internet as required by federal law.

Ouellette's specific additional claims set forth in his Amended Complaint are summarized as follows:

### A. Count II

Ouellette alleges Defendants Google, YouTube, BayTSP, Audible Magic and Myspace improperly used "scanning software" which located videos he posted on YouTube and Myspace, and misidentified those videos as infringing upon existing copyrights. As a result, Ouellette's videos were removed from the internet, and "strikes" were imposed against Ouellette's YouTube and Myspace accounts.

Ouellette alleges these Defendants are liable because they "operate[d] outside of" the provisions of the Digital Millennium Copyright Act of 1998 (DMCA), and they failed to comply with those provisions. He also asserts

Defendants are liable because they made misrepresentations as to copyright violations committed by Ouellette, and violated Ouellette's "fair use rights." Ouellette further contends Defendants "maliciously refused to restore [Ouellette's] Fair Use videos" to the internet.

### B. Counts III and IV

After Ouellette's videos were removed from the internet as described in Count II, Ouellette states he submitted "substantially complete" counter notices to Defendants Google and YouTube in accordance with the DMCA, but those entities refused to process Ouellette's counter notices due to minor errors in the notices. Ouellette asserts he advised the Defendants that he suffers from a reading disability that led to the minor errors. Ouellette claims the Defendants' actions deprived him of his "right to fair access to [Defendants'] 'public accommodation'," i.e. the "on-line theater", in violation of the Americans with Disabilities Act (ADA).

In Count IV Ouellette further contends that Defendants Google and YouTube's failure to process his DMCA counter notices violated his asserted right to make fair use of others' copyright materials.

### C. <u>Count V</u>

Ouellette states that after YouTube refused to process his counter notices as described in Count III, he sent counter notices to Defendant Viacom under the DMCA. According to Ouellette, Viacom refused to process those counter notices, and refused to comply with Ouellette's request that it retract its fraudulent assertion that Ouellette had violated its copyrights.

### D. <u>Count VI</u>

Ouellette alleges that various provisions of the Terms of Service (TOS) agreement that Defendants Google and YouTube require subscribers to sign are unfair or illegal. First, Ouellette contends the Defendants violated his rights under the ADA because the block lettering used in the TOS is impossible for him to read. And the Defendants do not provide an audio version of the TOS as an alternative. According to Ouellette, these Defendants have thus deprived him of his right to access their "place of public accommodation" as protected under the ADA.

Second, Ouellette alleges the TOS unlawfully requires a subscriber to consent to an improper jurisdiction and venue for a lawsuit initiated by a copyright owner against a YouTube subscriber.

Third, Ouellette alleges the TOS bars him from exercising his "fair use" right to download news videos for the purpose of critiquing those videos.

Fourth, the TOS permits Google and YouTube to violate the "safe harbor" provisions of the DMCA.

Finally, Ouellette contends the TOS gives third parties the right to harass him with false accusations of copyright infringement.

### E. Count VII

Ouellette advances similar claims under the ADA against Defendant Myspace stemming from provisions of its Terms of Use (TOU) agreement that Ouellette signed. Again he claims the TOU agreement contains block lettering which is impossible for Ouellette to read, and Myspace does not provide an audio version of the TOU. Consequently, Myspace's TOU agreement violates Ouellette's rights under the ADA.

Ouellette also alleges Defendants Audible Magic and Myspace engaged in conduct in violation of provisions of the DMCA. Those Defendants employ "filter blocks" to remove copyright-infringing videos from websites on the internet, and that procedure fails to comply with the "takedown" procedures established in the DMCA. Additionally, Myspace has refused to replace two of Ouellette's videos in

response to Ouellette's counter notices. Thus, Defendants' conduct violates Ouellette's right to make fair use of others' copyright materials.

### F. Count VIII

Ouellette's allegations in Count VIII appear to duplicate his allegations in Count VII. Ouellette again refers to two videos he posted on the internet through his Myspace account. Defendants Viacom and NBC Universal, through their agent, Audible Magic, asserted that Ouellette's videos infringed upon their copyrights. Consequently, Viacom and NBC Universal caused Ouellette's videos to be removed from the Myspace website, and Ouellette's right to post videos was suspended. Ouellette contends the removal of his videos was not in compliance with the "safe harbor" provisions of the DMCA.

Ouellette attempted to have the two referenced videos replaced on his Myspace account. He alleges that because Viacom and NBC Universal's claims of copyright infringement were false and improper, he submitted counter notices to Myspace requesting that the videos be replaced on his account. Myspace refused to process the counter notices, and refused to re-post Ouellette's videos. Ouellette alleges Defendants' conduct violated his fair use rights.

## III.  DISCUSSION

### A.  Standards for Review and Dismissal of Pro Se Pleadings

Because Ouellette is proceeding *pro se* the Court must construe his pleading liberally, and the pleading, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers[.]" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted).  *See also Neitzke v. Williams*, 490 U.S. 319, 330 n.9 (1989).

The Court retains discretion in determining whether a plaintiff's allegations are frivolous and thus subject to dismissal under 28 U.S.C. § 1915(e)(2).  *Denton v. Hernandez,* 504 U.S. 25, 33 (1992).  A complaint is legally frivolous within the meaning of § 1915 "where it lacks any arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989) (construing predecessor provision at 28 U.S.C. § 1915(d)).

Although the Court has authority to dismiss a defective pleading pursuant to 28 U.S.C. § 1915(e)(2),

> a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.

*Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).

8

## B. Fair Use

Ouellette's various claims allege Defendants have violated his right to make fair use of others' copyrighted materials. Ouellette's theory of liability, however, is not recognized under the law.

The common law doctrine of fair use, now codified at 17 U.S.C. § 107, is only an affirmative defense to a claim of copyright infringement, not an affirmative right on which a cause of action may be premised. *Eldred v. Ashcroft*, 537 U.S. 186, 219-220 (2003) (discussing the doctrine as a defense); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1163 (9th Cir. 2007) (same). A defendant's fair use of copyrighted material is merely an exception to the copyright owner's exclusive rights to that material (*Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1151 (9th Cir. 1986)), and such fair use does not constitute an infringement of a copyright. 17 U.S.C. § 107. Because the fair use doctrine is only an affirmative defense, it does not afford a person an enforceable, guaranteed, or constitutionally protected right to engage in any particular use of another's copyrighted material. *See 321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1101 (N.D. Cal. 2004) (citing *Eldred v. Ashcroft*, 537 U.S. 186 (2003)) and *Suntrust Bank v. Houghton Mifflin*


*Co.*, 268 F.3d 1257, 1260 n.3 (11th Cir. 2001) (recognizing that the fair use doctrine is not an affirmative right).

Ouellette's allegations that Defendants' conduct violated his alleged "fair use rights" are frivolous, and fail to state a claim on which relief may be granted. Those claims should be dismissed.

### C. Americans with Disabilities Act

Ouellette alleges Defendants Google, YouTube, and Myspace have violated his rights under the ADA. In substance, he alleges those Defendants discriminated against him based on his reading disability, and deprived him of access to their internet services and their "online theater" — a "place of public accommodation" governed by the ADA. The Court disagrees.

Title III of the ADA prohibits an owner of a place of public accommodation from engaging in discrimination, and the relevant provision of the ADA states as follows:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). To state a claim for relief under the ADA an individual must allege and establish that:

> (1) [he] is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a *place of public accommodation*; and (3) the plaintiff was denied public accommodations by the defendant because of [his] disability.

*Molski v. M.J. Cable*, 481 F.3d 724, 730 (9th Cir. 2007) (emphasis added).

The Ninth Circuit Court of Appeals has held that a "place of public accommodation" under Title III of the ADA must be an "actual, physical place[] where goods or services are open to the public, [... or a place] where the public gets those goods or services." *Weyer v. Twentieth Century Fox Film Corp*, 198 F.3d 1104, 1114 (9th Cir. 2000). Under the ADA, "some connection between the good or service complained of and an actual physical place is required." *Id*.

Various courts have considered whether a website on the internet qualifies as a "place of public accommodation" within the contemplation of the ADA. In *National Federation of the Blind v. Target Corporation*, 452 F. Supp. 2d 946 (N.D. Cal. 2006), the court considered whether defendant's website — Target.com — violated the ADA because it was inaccessible to individuals who are blind. Although the court determined that certain aspects of the plaintiff's allegations stated a claim for relief under the ADA, consistent with *Weyer* the court required that the allegations must establish a nexus between the use of the website and an actual, physical place. Thus, the court concluded "that to the extent that plaintiffs

11

allege that the inaccessibility of Target.com impedes the full and equal enjoyment of goods and services offered in [actual, physical] Target stores," the allegations stated a claim upon which relief could be granted. *National Federation*, 452 F. Supp. 2d at 956.

Generally, an internet website, by itself, is not an actual place, or a physical, concrete structure that would qualify as a place of public accommodation under the ADA. *Access Now, Inc. v. Southwest Airlines, Co.*, 227 F. Supp. 2d 1312, 1321 (S.D. Fla. 2002), affirmed 385 F.3d 1324, 1329 (11th Cir. 2004). Absent allegations that a website impedes the plaintiff's "access to a specific, physical, concrete space[,]" and absent allegations establishing a nexus between a website and a physical place of public accommodation, a plaintiff's allegations fail to state a claim upon which relief could be granted. *Id*. Services available on an internet website that have no connection to a physical place of accommodation do not fall within the ADA's "place of public accommodation" requirement. *Peoples v. Discover Financial Services, Inc.*, 2009 WL 3030217, *2 (E.D. Pa. 2009).

Ouellette's allegations purporting to advance claims under the ADA do not state a claim on which relief could be granted. His allegations fail to identify any actual, physical place where Defendants' services are made available, and fail to assert any connection between the internet websites he sought to access, and any

actual, physical structure or facility through which Defendants' services could be accessed or provided. To the contrary, Ouellette alleges only that Defendants' conduct has impeded his access to certain internet websites — the "online theater." Without more, a website does not constitute a physical "place of public accommodation" as required for a cognizable ADA claim. Accordingly, Ouellette's allegations under the ADA should be dismissed.

### D. Digital Millennium Copyright Act of 1998

Ouellette claims the Defendants engaged in conduct that violated certain procedures mandated by the DMCA. The procedures established by the DMCA on which Ouellette relies, however, do not create liability exposure for internet service providers, or other entities, in the circumstances alleged by Ouellette; the procedures do not create liability that does not already exist independent of the DMCA.

Congress enacted the DMCA to address the application of copyright law and liability for infringement in the context of "the online world." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004). Title II of the DMCA, enacted as the Online Copyright Infringement Liability Limitation Act (OCILLA), set forth in 17 U.S.C. § 512, seeks to "facilitate cooperation among Internet service providers and copyright owners 'to detect and deal with copyright infringements that take

place in the digital networked environment.'" *Ellison*, 357 F.3d at 1076 (quoting S. Rep. 105-190 at 20 (1998) and H.R. Rep. 105-551, pt. 2 at 49 (1998)).

The procedural mechanisms established under the DMCA and OCILLA are designed to facilitate the identification and removal of material placed on the internet that infringes upon a copyright. If a copyright owner identifies an infringement committed by an individual who subscribes to an internet service, the owner may serve a notice of the claimed infringement on the service provider, commonly referred to as a "takedown notice." 17 U.S.C. § 512(c)(1)(C) and (c)(3). In response, the service provider must remove the infringing material from the provider's website. 17 U.S.C. § 512(c)(1)(C).

After a takedown notice is issued and the material is removed from the website, the service subscriber may then challenge those actions through a counter notice. 17 U.S.C. § 512(g)(2)(C) and (g)(3). The subscriber may issue a counter notice which informs the service provider that the material was improperly removed from the website "as a result of a mistake or misidentification[.]" 17 U.S.C. § 512(g)(3)(C). Upon receipt of the counter notice the service provider must replace the subscriber's material on the website. 17 U.S.C. § 512(g)(2)(C).

The intent of the DMCA, OCILLA, § 512, and the foregoing procedures is to limit the liability of internet service providers, not to create liability that could

14

not otherwise be imposed under existing law independent of the DMCA. The statutory intent is "to provide 'greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities.'" *Ellison*, 357 F.3d at 1076 (quoting S. Rep. 105-190 at 20 (1998) and H.R. Rep. 105-551, pt. 2 at 49 (1998)).

In establishing that certainty, however, Congress chose not to rewrite or modify the existing doctrines that impose liability for copyright infringement as those doctrines apply to the online world. Instead, Congress elected to create various "safe harbors" in five specific circumstances, or categories of activity, which limit internet service providers' liability for copyright infringement — liability that could be founded upon the existing doctrines of copyright infringement law. *Ellison*, 357 F.3d at 1076-1077; *See* 17 U.S.C. § 512(a), (b), (c), (d), and (g) (identifying the safe harbors). Thus, rather than establish new grounds for claims of copyright infringement against online service providers, Congress chose to create "'limitations of liability [which] apply if the provider is found to be liable *under existing principles of law*.'" *Ellison*, 357 F.3d at 1077 (quoting from, and adding emphasis to S. Rep. 105-190 at 19). The "safe harbors" established under the DMCA "'do not affect the question of ultimate liability under the various doctrines of direct, vicarious, and contributory liability[]'" that

15

could otherwise be imposed under copyright law. *Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007) (quoting *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1174 (C.D. Cal. 2002)). The safe harbor provisions of 17 U.S.C. § 512 do not serve to imply that a service provider either is, or is not liable, either for conduct that qualifies for a safe harbor limitation, or for conduct that fails to qualify for the limitation. *Viacom International, Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 520 (S.D.N.Y. 2010) (quoting S. Rep. 105-190 at 40-41 (1998) and H.R. Rep. 105-551, pt. 2 at 50 (1998)). *See also* 17 U.S.C. § 512(l).

The procedural mechanisms of the DMCA on which Ouellette relies for the imposition of liability against Defendants are procedures that exist within two of the DMCA safe harbor provisions. The takedown notice procedures protect a service provider against liability to a copyright owner as long as the provider removes the infringing material in response to the copyright owner's takedown notice. 17 U.S.C. § 512(c)(1). Additionally, if a service provider complies with the counter notice procedures, the provider is protected against liability to a subscriber stemming from the removal of the material from the internet, and is protected against liability to a copyright owner when the provider replaces the subscriber's material in response to the subscriber's counter notice. 17 U.S.C. § 512(g)(1), (g)(2), and (g)(4).

Ouellette's reliance on the takedown and counter notice safe-harbor procedures in the DMCA is misplaced. The Defendants' alleged compliance, or non-compliance with the procedures does not provide a basis for liability. Defendants' liability to Ouellette, if any, could only be imposed under existing principles of law independent of the DMCA's procedural requirements. Ouellette's allegations, however, do not invoke any independent theory of liability. Therefore, his claims founded upon the DMCA should be dismissed.

### E. Misrepresentation Under the DMCA

In Count II, Ouellette alleges Defendants Google, YouTube, BayTSP, Audible Magic, and Myspace made misrepresentations asserting that Ouellette infringed upon certain copyrights. As noted in the Court's February 7, 2011 Order, misrepresentations made in takedown notices issued in accordance with the DMCA could give rise to liability against a defendant who issued the takedown notice. 17 U.S.C. § 512(f).

Ouellette's allegations, however, fail to state a claim of misrepresentation under 17 U.S.C. § 512(f). Ouellette does not allege in Count II that any Defendant made a misrepresentation in a takedown notice issued pursuant to the DMCA. To the contrary, Ouellette alleges Defendants engaged in conduct "outside of the

17

DMCA rules." Therefore, Ouellette's claims of misrepresentation should be dismissed.

### F. Terms of Service/Terms of Use Agreements

Ouellette's allegations in Counts VI and VII challenge provisions of Google and YouTube's TOS agreement, and provisions of Myspace's TOU agreement. To the extent Ouellette alleges those agreements violate his rights under the ADA, Ouellette has similarly failed to allege that Defendants' conduct impeded his access to any actual, physical place of public accommodation. Ouellette's allegations do not establish any connection between the agreements and Ouellette's impaired access to any physical facility. Therefore, Ouellette's ADA claims are subject to dismissal.

Ouellette also challenges the provisions of Google and YouTube's TOS which require him to consent to an improper jurisdiction and venue for any lawsuit that might be filed by a copyright owner. Ouellette, however, fails to suggest that the referenced provision is presently being enforced against him. Therefore, Ouellette's challenge to the provision fails to state a claim upon which relief could be granted.

Finally, Ouellette alleges Google and YouTube's TOS improperly grants third parties a right to harass him with false accusations of copyright infringement.

Under the facts alleged by Ouellette, however, Google and YouTube cannot be liable for the conduct of any third party. Therefore, this claim in Count VI should be dismissed.

## IV.  CONCLUSION

For the reasons stated, IT IS HEREBY RECOMMENDED that Ouellette's claims advanced in Counts II through VIII of his Amended Complaint should be DISMISSED as frivolous and for failure to state a claim on which relief could be granted. 28 U.S.C. § 1915(e)(2)(B)(i) and (ii).

DATED this 31st day of March, 2011.

      /s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge